1
2
3
4
5
6
7
8          IN THE UNITED STATES DISTRICT COURT

9          FOR THE EASTERN DISTRICT OF CALIFORNIA

10   ROBERT BENNETT,

11             Petitioner,                    No. CIV S-09-1992 GEB CHS

12        vs.

13   MATHEW CATES,

14             Respondent.        FINDINGS AND RECOMMENDATIONS

15   _____/

16                        I.  INTRODUCTION

17             Petitioner Bennett, a state prisoner, proceeds pro se with a petition for writ of

18   habeas corpus pursuant to 28 U.S.C. § 2254.  Bennett stands convicted of numerous offenses in

19   the Shasta County Superior Court, case number 05F1924, for which he is currently serving an

20   aggregate sentence of 15 years and 4 months.

21                        II.  BACKGROUND[1]

22             Pursuant to a warrant,[2] police officers conducted a search of a residence shortly

23   after Bennett left the residence in a car.  Behind a false ceiling in the garage, an officer located

24   _____

25        [1] *See People v. Bennett*, No. C052515, 2008 WL 217494, at 1-2 (Cal. App. Third Dist.,
     2008).

26        [2] The circumstances of the warrant will be discussed in greater detail *infra*.

                                  1

two snack food containers holding nearly 240 grams of cocaine base and more than 7 grams of cocaine salt, a sawed-off shotgun with a 14-inch barrel wrapped in duct tape, and what appeared to be "pay/owe" sheets.  Located in the same bag as the cocaine was a receipt for a money order made out to Bennett and a shipping label bearing his name. In the kitchen, officers located ammunition, scales (including an electronic gram scale), and four boxes of baking soda (which can be used to turn cocaine salt into cocaine base).

The master bedroom appeared as if someone was using it, and contained male hygiene products and clothing that appeared to be Bennett's size.  A loaded nine-millimeter handgun and a loaded .38 caliber revolver were discovered in the room in a location that was readily accessible from the bed.  Also located in the master bedroom was a large sum of money, two baggies containing white powder (one of which tested positive for cocaine base), a bag containing over 100 small plastic baggies, and paperwork that was consistent with pay-owe notations.  An insurance card, receipts for the repair of one of Bennett's vehicles, a fax cover sheet, "slips" from a copy store, numerous receipts from a local veterinary office, and legal paperwork- all bearing Bennett's name- were located in the closet of the master bedroom. Bennett's fingerprints were found on two of the empty baggies found in the master bedroom.

A second bedroom containing similarly sized clothing appeared to be used as a weight room, and a third bedroom containing female clothing did not appear to have been recently occupied.  A photo album containing pictures of Bennett was found in the living room area.  A car in the garage and a van parked at the house were registered to Bennett, as was the car he was driving when he was stopped by the police.  Officers later located $10,000 in cash under the kitchen sink after listening to a tape of a telephone call from Bennett to another individual.

An officer who was an expert on the possession of narcotics for sale testified that, based on his experience, the cocaine located in the residence was possessed for the purpose of sale.

/////

1    The police stopped Bennett's car shortly after he was observed leaving the

2    residence.  After law enforcement officers gave him *Miranda* warnings, Bennett admitted he had

3    been "in and out of the residence for several months" and that he had handled several of the

4    firearms there, although not the sawed-off shotgun.  Bennett also said several other people lived

5    at the residence.

6    Two neighbors picked Bennett out of a line-up as the individual who was living at

7    the residence at the time of the search.  One of these neighbors also identified him in court.

8    Bennett's friend testified she had visited him in Los Angeles between six and 10

9    times and, to the best of her knowledge, he lived there.

10   Bennett's former girlfriend testified that her brother and his acquaintance lived in

11   the residence searched by the officers and that Bennett had stayed there overnight on two

12   occasions.  According to the former girlfriend, she and Bennett owned dogs which her brother

13   allowed them to keep at the residence for a period of time.

14   A jury convicted Bennett of possession for sale of cocaine; possession for sale of

15   cocaine base; possession of cocaine while armed with a firearm; four counts of possession of a

16   firearm by a felon; possession of a deadly weapon; and illegal possession of ammunition.  The

17   jury also found true personal arming enhancements.  In a bench trial, the court found true prior

18   narcotics conviction enhancements and an enhancement for possession of cocaine while armed.

19   The trial court imposed an aggregate determinate sentence of 15 years four months.

20   Bennett appealed to the California Court of Appeal, Third District, where the

21   judgment was affirmed in an unpublished decision.  The California Supreme Court denied a

22   petition for review and further denied Bennett's state petition for writ of habeas corpus.

23                           III.  GROUNDS FOR RELIEF

24   The petition sets forth eight grounds for relief.  Each will be separately set forth

25   and discussed herein, except that grounds two and three will be addressed together in one

26   subsection.  Bennett claims:

3

Ground One: The trial court erred in admitting his statements given prior to *Miranda* warnings;

Ground Two: Trial counsel rendered ineffective assistance by failing to request the transcript of the preliminary hearing in order to raise a Fourth Amendment challenge to the search and seizure;

Ground Three: Appellate counsel rendered ineffective assistance by failing to raise on appeal trial counsel's alleged ineffective assistance;

Ground Four: The superior court denied him his right to effectively appeal his convictions by failing to provide a copy of the transcript of his preliminary hearing;

Ground Five: The trial court made an instructional error in relation to the sawed-off shotgun count;

Ground Six: An upper term sentence was imposed in violation of the rule set forth in *Blakely v. Washington*, 542 U.S. 296 (2004);

Ground Seven: Trial counsel rendered ineffective assistance at sentencing; and

Ground Eight: The trial court's decision not to stay sentencing on counts two, nine, and ten violated section 654 of the California Penal Code and federal due process.

## IV.  APPLICABLE LAW FOR FEDERAL HABEAS CORPUS

An application for writ of habeas corpus by a person in custody under judgment of a state court can be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. §2254(a); *see also Peltier v. Wright*, 15 F.3d 860, 861 (9th Cir. 1993); *Middleton v. Cupp*, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing *Engle v. Isaac*, 456 U.S. 107, 119 (1982)). This petition for writ of habeas corpus was filed after the effective date of, and thus is subject to, the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  *Lindh v. Murphy*, 521 U.S. 320, 326 (1997); *see also Weaver v. Thompson*, 197 F.3d 359 (9th Cir. 1999).  Under the AEDPA, federal habeas corpus relief is also precluded for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

1
2
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

3
4
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

5   28 U.S.C. § 2254(d); *see also Penry v. Johnson*, 532 U.S. 782, 792-93 (2001); *Williams v.*

6   *Taylor*, 529 U.S. 362, 402-03 (2000); *Lockhart v. Terhune*, 250 F.3d 1223, 1229 (9th Cir. 2001).

7           This court looks to the last reasoned state court decision to determine whether the

8   law applied to a particular claim by the state courts was contrary to the law set forth in the cases

9   of the United States Supreme Court or whether an unreasonable application of such law has

10  occurred. *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002), *cert. dismissed*, 538 U.S. 919. The

11  state court's factual findings are presumed correct if not rebutted with clear and convincing

12  evidence. 28 U.S.C. § 2254(e)(1); *Taylor v. Maddox*, 336 F.3d 992, 1000 (9th Cir. 2004). It is

13  the habeas corpus petitioner's burden to show the state court's decision was either contrary to or

14  an unreasonable application of federal law. *Woodford v. Visciotti*, 537 U.S. 19, 25 (2002).

15                                    V.  DISCUSSION

16          A.      Ground One: Admission of the un-*Mirandized* Statements

17          After Bennett left the residence in his car, he was stopped and arrested on an

18  unrelated warrant. Another officer arrived and, prior to the time Bennett was given his *Miranda*

19  rights, asked him if anyone else was at his residence. Bennett told the officer there was no one

20  else at the house. The officer asked Bennett if he had any animals at his residence, and Bennett

21  said he had dogs in the backyard. The officer asked Bennett if he had keys to the residence.

22  Bennett said he did, and gave the officer the keys. The officer gained access to the residence

23  with the keys provided by Bennett.

24          Bennett moved to suppress these statements based on the officer's failure to read

25  him his *Miranda* rights before questioning him. The trial court ruled that the statements were

26  admissible because the officer's questions were not designed to elicit an incriminating response

within the meaning of *Miranda*.  On appeal, the state court rejected Bennett's claim of error,

holding that he was not prejudiced by admission of the statements.

When a person in custody is subjected to interrogation, *Miranda* rights must be

first given in order for the information obtained to be admissible in court.  *See Miranda v.*

*Arizona*, 384 U.S. 436, 467-68 (1966).  "Statements elicited in noncompliance with this rule may

not be admitted for certain purposes in a criminal trial."  *Stansbury v. California*, 511 U.S. 318,

322 (1994) (per curiam).

For *Miranda* purposes, custodial interrogation means "questioning initiated by

law enforcement officers after a person has been taken into custody or otherwise deprived of his

freedom of action in any significant way."  *Miranda*, 384 U.S. at 444.  Two discrete inquiries are

essential to the custody determination: first, what were the circumstances surrounding the

interrogation; and second, given those circumstances, would a reasonable person have felt at

liberty to terminate the interrogation and leave.  *Thompson v. Keohane*, 516 U.S. 99, 112 (1995).

The second inquiry is objective; the relevant question is whether there was "a formal arrest or

restraint on freedom of movement of the degree associated with a formal arrest."  *Maryland v.*

*Shatzer*, 130 S. Ct. 1213, 1224 (2010) (citing *New York v. Quarles*, 467 U.S. 649, 655 (1984)).

*Miranda* error is subject to harmless error analysis.  *Ghent v. Woodford*, 279 F.3d

1121, 1126 (9th Cir. 2002).  On habeas corpus review, a federal court assesses the prejudicial

impact of constitutional error in a state-court criminal trial under the "substantial and injurious

effect" standard set forth in *Brecht v. Abrahamson*, 507 U.S. 619 (1993).  *Fry v. Pliler*, 551 U.S.

112 (2007).  The relevant question is whether the *Miranda* violation "had substantial and

injurious effect or influence in determining the jury's verdict."  *Brecht*, 507 U.S. at 637 (internal

quotation marks and citation omitted).

Here, Bennett told the officer that was that no one else was at the residence and

that he did not expect anyone to arrive soon.  According to the questioning officer, Bennett

answered in the affirmative when asked whether he had locked the doors to "his" house.

1   (Reporter's Transcript ("RT") at 281-82.)  Both his awareness of who was at the residence and

2   the fact that he locked the residence upon leaving were explained by the fact that he had just left

3   there.  The state court reasonably concluded on appeal that Bennett's responses in this regard did

4   not implicate him as a resident of the home to any greater degree than the officer's observation of

5   his departure from the home.  *See People v. Bennett*, *supra*, at 3.

6           Bennett said that his dogs were in the backyard of the residence.  (RT at 282.)

7   This statement was cumulative to other evidence on the subject.  A neighbor testified that she

8   had spoken to Bennett about his dogs before (RT at 296-97), and his former girlfriend testified

9   that they kept their dogs at the residence (RT at 362-63).  Numerous veterinary bills with

10  Bennett's name on them were found in the master bedroom.  As the state court held, ample

11  evidence established that his dogs were at the residence, independent of his statement to that

12  effect.  *See People v. Bennett*, *supra*, at 3.

13          Bennett also told the officer that he had a key to the house.  The discovery of the

14  key did not implicate *Miranda*.  *See United States v. Patane*, 542 U.S. 630, 636-37 (2004)

15  (plurality opinion) (noting there is "no justification" for extending *Miranda* to the context of the

16  physical fruit of a voluntary statement); *New York v. Quarles*, 467 U.S. 649, 657-58 (1984)

17  (physical evidence obtained through an uncoerced but non-*Mirandized* statement is admissible).

18  Bennett's admission that he had the key was merely cumulative of the physical evidence.

19          Finally, substantial other evidence tied Bennett to the residence:

20      Neighbors identified [Bennett] as the person living there. [Bennett]
        admitted himself he had been "in and out of the residence for
21      several months."  Legal paperwork, and insurance card, receipts
        and bills, all bearing [Bennett]'s name, were located in the
22      residence, as was a photo album containing pictures of him.  Two
        vehicles at the residence, as well as the car [Bennett] was driving
23      when he left the residence, were registered to him.  And it was
        [Bennett]'s statements during a monitored telephone call that led to
24      the discovery of a large sum of money hidden in the residence.

25  *People v. Bennett*, *supra*, at 3.

26  /////

                                                7

1        That no one of Bennett's un-*Mirandized* statements was mentioned during either

2  party's closing statement underscores the minimal significance the evidence had in establishing

3  his guilt on the counts of conviction.  Regardless of whether the statements were admitted in

4  error, reversal is not required because the state court's finding of no prejudice was reasonable.

5  *See Brecht*, 507 U.S. at 637.

6        B.     Grounds Two and Three: The Preliminary Hearing Transcript and

7             Ineffective Assistance of Counsel

8        1.     Additional Background

9        On March 23, 2005, Investigator Cogle of the Redding Police Department

10  prepared an affidavit supporting a search warrant application for the premises at 3638

11  Sacramento Drive in Redding, California.  (*See* Search Warrant and Affidavit dated March 23,

12  2005, attached to the petition as Exhibit G.)  The affidavit indicated that Cogle had been trained

13  in the appearance of cocaine and other narcotics, had spoken with drug users and dealers

14  concerning the common methods of using and selling cocaine and other narcotics, and had

15  investigated approximately 100 narcotics possession and possession for sales cases.  Cogle

16  received most of his information from a confidential reliable informant (CRI), who had

17  previously provided him with "precise, timely and accurate" information.  CRI, a drug addict,

18  had charges pending but was not receiving consideration for the information provided.

19        According to the affidavit, between March 7, 2005 and March 11, 2005, Cogle

20  received information from CRI that a black male adult between thirty-five and forty years of age

21  had been selling rock cocaine and marijuana at his residence on Sacramento Drive in Redding.

22  CRI knew the man as "Bobo" and believed his first name was "Robert."  CRI said Robert was a

23  "big guy" who had been in the area for a few months; CRI believed Robert had come to Redding

24  from the Los Angeles area.  CRI described a maroon van often parked in the driveway of the

25  residence and multiple other vehicles, including a Chevy Suburban, sometimes driven by Robert.

26  CRI thought Robert was a "high level" dealer.  CRI had purchased rock cocaine from Robert at

the house on Sacramento Drive "countless" times, most recently about three weeks or one month prior to his conversation with Cogle.

On March 22, 2005, Cogle followed up on the information provided by CRI. Cogle drove to 3638 Sacramento Drive and saw a maroon van and a Chevy Suburban parked in the driveway of a residence matching the description of the residence given by CRI. Records checks revealed that the Suburban was registered to Robert Bennett of Los Angeles, a black male adult standing 6'2" tall and weighing 265 pounds. Bennett had been arrested in Redding in 2003 and had an outstanding felony arrest warrant in West Covina.

Later that same day, CRI directed Cogle to the residence at 3638 Sacramento Drive. CRI also identified the driver's license photo of Robert Bennett as "Bobo" who lived there.

The next day, on March 23, 2005, Cogle interviewed another confidential informant (CI). CI, another drug addict, had also purchased rock cocaine from Bobo, who lived on Sacramento Drive. CI thought Bobo's real name was Robert. According to CI, Robert drove a black Suburban and several other vehicles. CI had been purchasing rock cocaine from Robert for months and had done so within the last seven days. CI did not receive any consideration for his information. Cogle did not know whether CI had any criminal charges pending.

Thereafter, investigators from the Redding Police Department conducted surveillance on the residence at 3638 Sacramento Drive. Bennett was observed leaving the residence in a Chevrolet Caprice that was registered to him with a Los Angeles address. Investigators conducted an enforcement stop, and arrested Robert Bennett on the outstanding warrant. Investigators searched Bennett and his vehicle and found two cellular phones and $578.00 cash. The money was mostly in small denominations which, from training and experience, Cogle knew was common for drug dealers. A drug detection K9 alerted on the front driver's door, center console, back seat, and on cash found in the vehicle, although no drugs were found. An investigator found what appeared to be pay/owe sheets in the vehicle.

1    Investigators arrived at 3638 Sacramento Drive to secure the residence and

2    prevent anyone from entering pending the issuance of a search warrant.  During a protective

3    sweep of the residence police saw marijuana and a rifle case in plain view.

4    Based on the information in Cogle's affidavit, a magistrate found probable cause

5    and issued the search warrant that same day.  Investigators executed the search warrant and

6    seized the various items of evidence that were later admitted at Bennett's trial.

7    2.    Analysis of the Ineffective Assistance Claims

8    Bennett alleges that trial counsel rendered ineffective assistance by failing to

9    obtain a copy of the transcript of the April 7, 2005 preliminary hearing to support a motion to

10   suppress evidence of the items found in the residence at 3638 Sacramento Drive as illegally

11   seized in violation of the Fourth Amendment, pursuant to section 1538.5 of the California Penal

12   Code.  Had the evidence been suppressed on this ground, Bennett contends, a motion to dismiss

13   would have been granted pursuant to section 995 of the California Penal Code.  Bennett

14   additionally claims that appellate counsel deficiently failed to raise the issue of trial counsel's

15   ineffectiveness in this regard.  Bennett presented these grounds to the California Supreme Court

16   where they were rejected without comment on habeas corpus review.

17   To demonstrate a denial of the Sixth Amendment right to the effective assistance

18   of counsel, a petitioner must establish that counsel's performance fell below an objective

19   standard of reasonableness, and that he suffered prejudice from the deficient performance.

20   *Strickland v. Washington*, 466 U.S. 668, 690 (1984).  Deficient performance requires a showing

21   that counsel's performance was "outside the wide range of professionally competent assistance."

22   *Id*. at 687 & 697.  Prejudice is found where there is a reasonable probability that, but for

23   counsel's unprofessional errors, the result of the proceeding would have been different.  *Id*.  The

24   *Strickland* test for ineffective assistance of counsel applies to trial counsel's performance as well

25   as appellate counsel's performance.  *See Smith v. Robbins*, 528 U.S. 259, 285 (2000) (citing

26   *Smith v. Murray*, 477 U.S. 527, 535-36 (1986).

1     "Surmounting *Strickland's* high bar is never an easy task," and review under the

2  AEDPA is doubly deferential.  *Harrington v. Richter*, 131 S. Ct. 770, 787 (2011) (citing *Padilla*

3  *v. Kentucky*, 130 S. Ct. 1473, 1485 (2010)).  The relevant question is whether there is any

4  reasonable argument that counsel satisfied *Strickland's* deferential standard.  *Harrington*, 131 S.

5  Ct. at 788.

6     Trial counsel's failure to obtain the preliminary hearing transcript, standing alone,

7  did not constitute deficient performance.  Bennett fails to explain how the transcript of the

8  preliminary hearing was necessary to challenge the statement of probable cause upon which the

9  warrant was based.  Counsel could have raised the Fourth Amendment issue using the search

10  warrant itself and the Cogle affidavit, both of which are attached to the pending petition.  It is not

11  apparent what additional value the preliminary hearing transcript would have offered and Bennett

12  fails to demonstrate that counsel performed deficiently merely by failing to obtain a copy.

13     Moreover, because Cogle's affidavit contained sufficient probable case for the

14  issuance of a warrant, a suppression motion would have been without merit.  To prevail on a

15  claim of ineffective assistance of counsel for failing to file a motion to suppress evidence seized

16  in an unlawful search, a petitioner must prove that his Fourth Amendment claim was meritorious

17  and show a reasonable probability that the result of the proceeding would have been different

18  absent the excludable evidence.  *Kimmelman v. Morrison*, 477 U.S. 365, 375 (1986).

19     The basic standard for probable cause to issue a search warrant is "whether, given

20  all the circumstances set forth in the affidavit... including the "veracity" and "basis of

21  knowledge" of persons supplying hearsay information, there is a probability that contraband or

22  evidence of a crime will be found in a particular place."  *Illinois v. Gates*, 462 U.S. 213, 238

23  (1983).  The Fourth Amendment requires only that a substantial basis exist for concluding that a

24  search would uncover evidence of wrongdoing.  *Id*. at 236.

25     Affidavits supporting a search warrant are presumptively valid.  *Franks v.*

26  *Delaware*, 438 U.S. 154, 171 (1978); *see also Gates*, 462 U.S. at 237 n.10 ("the resolution of

1  doubtful or marginal cases in this area should be largely determined by the preference to be

2  accorded warrants").  Where an affidavit is based, in part, on hearsay information from

3  confidential informants,

> 4  [the] informant's "veracity," "reliability," and "basis of
> knowledge" are all highly relevant in determining the value of his
> 5  report.... [T]hese elements... should be understood simply as
> closely intertwined issues that may usefully illuminate the
> 6  commonsense, practical question whether there is "probable cause"
> to believe that contraband or evidence is located in a particular
> 7  place.

8  *Gates*, 462 U.S. at 230.

9          In California, "information from an untested or unreliable informant does not

10  establish probable cause unless it is corroborated in essential respects by other facts, sources or

11  circumstances."  *People v. Maestas*, 204 Cal. App. 3d 1208, 1220 (1988) (internal quotation

12  omitted).  On the other hand, an informant who provides a large amount of detailed, firsthand

13  information is entitled to some credit of reliability.  *See generally People v. Foster*, 201 Cal.

14  App. 3d 20, 24 (1988).  Additionally, where an informant has provided accurate information on

15  past occasions, he or she may be presumed trustworthy on subsequent occasions.  *See*, *e.g.*,

16  *People v. Hansborough*, 199 Cal. App. 3d 579, 584 (1988); *People v. Dumas*, 9 Cal. 3d 871, 876

17  (1973).

18          Here, probable cause for issuance of the search warrant existed under the totality

19  of the circumstances test stated in *Gates*.  The affidavit recited Cogle's background and training

20  in the use and sales of controlled substances.  The CRI had established reliability by previously

21  providing Cogle with useful and accurate information.  The CRI, who was familiar with rock

22  cocaine from personal use, had purchased rock cocaine from Bennett on "countless" occasions.

23  Under these circumstances, there was no requirement for strict corroboration of CRI's

24  information.  In any event, much of the information provided by CRI was corroborated by CI and

25  by Cogle's observations and records checks.  Because the issuance of the warrant was supported

26  by probable cause, the search of the residence was lawful.

1    Because search of the residence at 3638 Sacramento Drive was lawful, a motion

2 by trial counsel to suppress the seized evidence pursuant to section 1538.5 of the California Penal

3 Code would have been unsuccessful.  Because evidence of the items seized, in addition to

4 witness testimony, provided probable cause to indict Bennett, a motion to set aside the

5 indictment pursuant to section 995 of the California Penal Code would likewise have been

6 without merit.  Accordingly, neither trial nor appellate counsel performed deficiently.  For the

7 same reasons, Bennett also fails to demonstrate prejudice.  No relief is available for either

8 counsel's alleged ineffective assistance in relation to the Fourth Amendment search and seizure

9 issue.

10    C.    Ground Four: Preliminary Transcript and the Right to Appeal

11    In a related claim, Bennett contends that the clerk of the Shasta County Superior

12 Court failed to provide a copy of the April 7, 2005 preliminary hearing transcript to his appellate

13 counsel and to the state court to which his direct appeal was taken.  Bennett contends that this

14 omission denied him the opportunity to meaningfully and effectively appeal his conviction in

15 violation of his constitutional rights and section 1237 of the California Penal Code.  Bennett

16 presented this claim on state habeas corpus to the California Supreme Court where it was

17 rejected without written explanation.

18    To the extent this claim challenges the state court's failure to comply with section

19 1237 of the California Penal Code, it fails.  Federal habeas corpus relief is not available to correct

20 an error of state law.  *Estelle v. McGuire*, 502 U.S. 62, 67 (1991).

21    As a matter of constitutional law, "the State must provide an indigent defendant

22 with a transcript of prior proceedings when that transcript is needed for an effective defense or

23 appeal." *Britt v. North Carolina*, 404 U.S. 226, 227 (1971).  "[T]wo factors [ ] are relevant to the

24 determination of need: (1) the value of the transcript to the defendant in connection with the

25 appeal or trial for which it is sought, and (2) the availability of alternative devices that would

26 fulfill the same functions as a transcript."  *Id.*; *but see also United States v. Devlin*, 13 F.3d 1361,

1364 (9th Cir. 1994) (explaining that because denying transcripts can lead to lengthy appeals and reversals, it is preferable that courts "routinely grant indigent defendants' timely requests for free transcripts of significant prior proceedings, unless a substantially equivalent alternative device is available").

In this case, Bennett filed a "petition for writ of mandate" with the Shasta County Superior Court requesting the preliminary hearing transcript more than three years after the hearing was held and after all proceedings in that court were concluded.  (*See* Petition, Exhibit I.) The request was denied; the superior court noted it had no jurisdiction to entertain the motion because there was no pending legal proceeding.  Bennett fails to specifically allege that he or either of his attorneys made a *timely* request for a copy of the preliminary hearing transcript for use at trial or on appeal.  Even if such a request was made and denied, however, the claim fails for lack of prejudice.

Under some circumstances, the complete denial of a transcript for trial or appeal purposes constitutes structural error.  *See Kennedy v. Lockyer*, 379 F.3d 1041, 1053 (9th Cir. 2004) (naming as potential examples circumstances (1) where the state completely fails to provide a defendant with a transcript of a mistrial for use in connection with a second trial, (2) where "significant and crucial portions" of the proceedings are omitted, or (3) where a preliminary hearing transcript with key witness testimony is denied for use at trial).  Harmless error analysis applies, however, to the alleged denial of the preliminary hearing transcript for appeal purposes in this case.  *See Id*. (harmless error analysis applies where the state fails to provide only a portion of the transcript); *Id*. at n.14 ("[W]e would be unlikely to find that a failure to provide insignificant and inconsequential portions of the proceedings would result in reversible error."); *United States v. Devlin*, 13 F.3d 1361, 1364-65 (9th Cir. 1994) (applying harmless error where the trial court failed to provide the defendant with a transcript of a suppression hearing conducted prior to trial).

/////

14

Of importance here is that neither issue Bennett claims to have been denied the ability to raise (namely, a suppression issue and a motion to dismiss or set aside the information) were available to him on appeal.  A motion to suppress must be brought before trial or, under limited circumstances, during the trial; otherwise, it is considered untimely.  *See* Cal. Pen. Code §1538.5; *see also People v. Frazier*, 128 Cal. App.4th 807, 828-29 (3rd Dist. 2005).  Likewise, a motion to dismiss or set aside an information is moot after a jury has found the defendant guilty beyond a reasonable doubt.  *See generally United States v. Mechanik*, 475 U.S. 66, 70 (1986); *People v. Crittenden*, 9 Cal.4th 83, 136-37 (1994) ("Where the evidence produced at trial amply supports the jury's finding, any question whether the evidence produced at the preliminary hearing supported the finding of probable cause is rendered moot.")

Because neither issue was cognizable on appeal, the preliminary hearing transcript was not essential and the superior court's alleged denial of the transcript did not have substantial and injurious effect or influence on the outcome of Bennett's case.  *See Brecht*, 507 U.S. at 624.  The state court's unexplained rejection of this claim was not contrary to, or an unreasonable application of clearly established federal law.

D.      Ground Five: Instructional Error

Bennett challenges the trial court's jury instructions on count nine.  On count nine, the jury was initially instructed:

> Every person who possesses any undetectable firearm is guilty of a violation of Penal Code Section 12020, a crime.  It is not necessary that the weapon be concealed upon the defendant's person or be capable of such concealment, or that it be carried upon his person.
>
> There are two kinds of possession: actual possession and constructive possession.  Actual possession requires that a person knowingly exercise direct physical control over a thing.  Constructive possession does not require actual possession but does require that a person knowingly exercise control over [ ] the right to control a thing either directly or through another person or persons.
>
> One person may have possession alone, or two or more persons may share actual or constructive possession.

15

> In order to prove this crime, each of the following elements must be proved: One, a person possessed an undetectable firearm; and two, the instrument or weapon was of the kind commonly known as a sawed-off shotgun.

(RT at 457.)  After a few more instructions were given, the jury was dismissed for lunch. Outside the jury's presence, the prosecutor brought to the court's attention that the jury had been mis-instructed and the court agreed.  Upon the jury's return, the court stated:

> Counsel pointed out to me right after you left that I inadvertently misread a little bit of the instructions, so I'm just going to go over it real briefly....
>
> ....
>
> [A]s to Count 9, which is having possession of an instrument, in violation of Penal Code Section 12020, it should read:
>
> Every person who has any instrument or weapon of the kind commonly known as a sawed-off shotgun is guilty of a violation of Penal code section 12020.  And in order to prove this crime, each of the following elements must be proved: One, a person possessed a shotgun; and two, the instrument or weapon was the kind commonly known as a sawed-off shotgun.
>
> So those are the corrected versions – or the written versions that you'll have with you in the jury room.

(RT at 467.)

Bennett contends the instruction as given erroneously omitted the definition of "sawed-off shotgun" and the required mental state that its possessor have knowledge of its illegal characteristics (i.e., that it is unusually short).  On appeal, the state court recognized California rules of law that trial courts must define technical terms in jury instructions and that in order to be convicted of this crime the weapon's possessor must have knowledge of the weapon's illegal characteristics.  *People v. Bennett*, *supra*, at 4.  Nevertheless, the state court denied Bennett's claim for relief because it found no prejudice.  *Id.* at 4-5.

A claim of instructional error does not raise a cognizable federal claim unless the error, considered in context of all the instructions and the trial record as a whole, "so infected the

1    entire trial that the resulting conviction violates due process." *McGuire*, 502 U.S. at 71-72 ; *see*

2    *also Henderson v. Kibbe,* 431 U.S. 145, 152-55, n.10 (1977); *Cupp v. Nauhten,* 414 U.S. 141,

3    146-47 (1973).  In addition, on federal habeas corpus review, no relief can be granted without a

4    showing that the instructional error had a "substantial and injurious effect or influence in

5    determining the jury's verdict." *Calderon v. Coleman*, 525 U.S. 141, 147 (1998) (citing *Brecht*,

6    507 U.S. at 637).  "It is the rare case in which an improper instruction will justify reversal of a

7    criminal conviction when no objection has been made in the trial court" (*Kibbe*, 431 U.S. at 154),

8    as the case is here.  *See also Boyd v. United States*, 271 U.S. 104, 108 (1925) ("after permitting

9    [the instruction] to pass as satisfactory then, the defendant is not now in a position to object to

10   it").  Finally, an omitted instruction is less likely to be prejudicial than a misstatement of the law.

11   *Id*. at 155.

12          Under this demanding standard, relief is not warranted.  Omission of the

13   definition of "sawed-off shotgun" and the required mental state from the jury instructions did not

14   implicate the fairness of Bennett's trial:

15          [T]he evidence was uncontroverted that the firearm in question...
             was of the type proscribed by the statute... [¶]...[¶]...[¶] The
16          weapon at issue here was a sawed-off shotgun with a 14-inch barrel
             (a barrel a full 4 inches shorter than the minimum) wrapped in duct
17          tape, hidden in the same location as a bag containing a substantial
             amount of cocaine base and a money order receipt made out to
18          defendant.  The jury's verdicts reflect a determination that
             [Bennett] possessed the sawed-off shotgun and the cocaine base
19          hidden in the same location.  There is no evidence in the record on
             which the jurors, had they been instructed on the requisite mental
20          state, might have concluded that [Bennett] possessed the sawed-off
             shotgun without ever having observed it.  And, having observed
21          the weapon, [Bennett] was necessarily aware of its shortness...
             [T]he error here must be deemed harmless.

22

23   *People v. Bennett*, *supra*, at 4-5.  For these reasons, any error of state law in the instruction on the

24   sawed-off shotgun count did not render Bennett's trial fundamentally unfair.  Likewise, if there

25   was error, it did not have substantial and injurious effect or influence in determining the jury's

26   verdict.  *See Brecht*, 507 U.S. at 637.  The state court's finding of no prejudice is not contrary to,

17

1   or an unreasonable application of clearly established federal law.

2          E.      Ground Six: Upper Term Sentence

3          On count three (possession of cocaine base for sale) and its accompanying firearm

4   enhancement, Bennett was sentenced to two upper terms of five years.  (RT at 515-16.)  He

5   claims the court's selection of these upper terms violated his right to due process, trial by jury,

6   and the rule of *Blakely v. Washington*, 542 U.S. 296 (2004).

7          "Other than the fact of a prior conviction, any fact that increases the penalty for a

8   crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond

9   a reasonable doubt."  *Apprendi\ v. New Jersey*, 530 U.S. 466, 490 (2000).  In *Blakely v.

10  Washington*, the Supreme Court clarified "the 'statutory maximum' for *Apprendi* purposes is the

11  maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury

12  verdict or admitted by the defendant*."  *Blakely*, 542 U.S. 296, 303-304 (2004) (emphasis in

13  original).

14         Under California's determinate sentencing scheme, the relevant statutory

15  maximum is the middle term rather than the upper term.  *Cunningham v. California*, 549 U.S.

16  270, 293 (2007).  The existence of a single lawfully found aggravating factor is sufficient to

17  authorize an upper term sentence.  *People v. Black*, 41 Cal.4th 799, 805-06, 816 (2007) ("*Black

18  II*"); *see also Butler v. Curry*, 528 F.3d 624, 643-44 (9th Cir. 2008).

19         Contrary to Bennett's argument that the trial court did not indicate its reasons for

20  imposing upper terms, the trial judge specifically stated that its reasons for doing so appeared

21  within the body of the probation report.  Specifically, the trial court stated it was "going to follow

22  the [recommendation in the probation] report, and most of the reasoning is in the body of the

23  report...."  (RT at 515.)  The body of the report included, among other things, a list of Bennett's

24  prior convictions, which included three felony and two misdemeanor convictions.  (Clerk's

25  Transcript at 281.)

26  /////

18

1        One aggravating factor that supports imposition of an upper term in California is

2   that the defendant's prior convictions are "numerous or of increasing seriousness."  Cal. R. Ct.

3   4.421(b)(2).  Bennett's three prior felony convictions and two prior misdemeanor convictions are

4   "numerous" within the meaning of Rule 4.421.  *See Black II*, 41 Cal.4th at 818 (two prior felony

5   convictions and three prior misdemeanor convictions were "numerous"); *People v. Searle*, 213

6   Cal.App.3d 1091, 1098 (1989) (three prior convictions were "numerous" in context of the

7   predecessor to Rule 4.421).

8        The trial court properly relied on Bennett's prior convictions without a jury

9   finding in imposing upper terms on count three and its accompanying firearm enhancement.

10  Supreme Court precedent does not preclude imposition of an upper term based on the fact of a

11  prior conviction.  *See Blakely*, 542 U.S. at 301 ("*Other than the fact of a prior conviction*, any

12  fact that increases the penalty for a crime beyond the prescribed statutory maximum must be

13  submitted to a jury, and proved beyond a reasonable doubt." (emphasis added)); *Apprendi*, 530

14  U.S. at 490; *Almendarez-Torres v. United States*, 523 U.S. 224, 247 (1998).

15       To the extent the trial judge relied on any factors in the body of the probation

16  report other than Bennett's prior convictions, those factors were relevant only to the selection of

17  a sentence within the authorized statutory term, which included the upper term.  *See Butler*, 528

18  F.3d 624 (9th Cir. 2008) (the Sixth Amendment does not prevent judges from "exercis[ing]

19  discretion-taking into consideration various factors relating both to offense and offender- in

20  imposing a judgment *within the range* prescribed by statute."  *Id*. (emphasis in original) (quoting

21  *Apprendi*, 530 U.S. at 481).  Bennett's upper term sentences were within the statutory maximums

22  allowable by virtue of his prior convictions.

23       F.    Ground Seven: Ineffective Assistance of Trial Counsel at Sentencing

24       In a related claim, Bennett contends that trial counsel rendered ineffective

25  assistance by failing to object at sentencing to the trial court's imposition of the upper term

26  sentences discussed in the previous ground.  Because the upper term sentences were lawfully

1  imposed based on prior convictions, trial counsel's failure to object was not deficient

2  performance, and no prejudice ensued.  *See Strickland*, 466 U.S. at 690.

3          G.      Ground Eight: Application of Section 654 at Sentencing

4          After conviction, the trial court sentenced Bennett to state prison for an aggregate

5  term of fifteen years and four months, computed as follows: the upper term of five years on count

6  three (possession of cocaine base for sale); a consecutive one year term as one-third the middle

7  term on count two (possession of cocaine for sale); a consecutive eight-month term as one third

8  the middle base term on count nine (possession of a deadly or dangerous weapon); a consecutive

9  eight-month term for count ten (illegal possession of ammunition); a consecutive five-year term

10  for personal use of a firearm; and a consecutive three-year term for the prior narcotics conviction

11  enhancement.  Sentences on the remaining counts and enhancements were stayed pursuant to

12  section 654 of the California Penal Code, which prohibits multiple punishments for a single act

13  or omission that is punishable by different provisions of law.  For his final ground, Bennett

14  claims his sentence violated section 654 and federal due process because he was punished twice

15  for the same conduct.  Although the trial court stayed sentencing on counts four, five, six, seven,

16  and eight, Bennett contends punishment should also have been stayed on counts two, nine, and

17  ten because his conduct during commission of all those offenses was incident to a single

18  objective.

19          To the extent this claim challenges the application of a section 654, a state

20  sentencing law, it fails.  Absent fundamental unfairness, federal habeas corpus relief is not

21  available for a state court's misapplication of its own sentencing laws.  *McGuire*, 502 U.S. at 67;

22  *see also Richmond v. Lewis*, 506 U.S. 40, 50 (1992) (the misapplication of state sentencing law

23  results in a due process or Eighth Amendment violation only if the sentence is arbitrary and

24  capricious); *Watts v. Bonneville*, 879 F.2d 685, 687 (9th Cir. 1989) (alleged violation of section

25  654 is not cognizable on federal habeas corpus review).

26  /////

1          To the extent Bennett premises his claim on the due process clause, it still fails.  A

2  petitioner may not "transform a state-law issue into a federal one merely by asserting a violation

3  of due process." *Langford v. Day*, 110 F.3d 1380, 1389 (9th Cir. 1997).  Contrary to Bennett's

4  argument, he was not punished multiple times for the same conduct simply because he had a

5  single objective for all of his conduct.[3]  No fundamental unfairness appears in the manner of

6  sentencing and habeas corpus relief is not available.

7                           VI.  CONCLUSION

8          For all the foregoing reasons, IT IS HEREBY RECOMMENDED that the

9  application for writ of habeas corpus be DENIED.

10          These findings and recommendations are submitted to the United States District

11  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1).  Within twenty-

12  one days after being served with these findings and recommendations, any party may file written

13  objections with the court and serve a copy on all parties.  Such a document should be captioned

14  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

15  shall be served and filed within seven days after service of the objections.  Failure to file

16  objections within the specified time may waive the right to appeal the District Court's order.

17  *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir.

18  1991).

19  DATED: August 22, 2011

20

                                    *Charlene H. Sorrentino*

21                                  CHARLENE H. SORRENTINO
                                  UNITED STATES MAGISTRATE JUDGE

22

23

24

25      [3] The "single objective" test relates to the application of section 654.  If various offenses constituting a single course of conduct were incident to one objective, under section 654 the defendant shall be punished only once.  *See People v. Perez*, 23 Cal.3d 545, 551 (1979) (citing

26  Cal. Pen. Code § 654).